Denio, J.
If the plaintiffs had, as they have alleged in the complaint, purchased of the defendant the notes which the latter held against E. & Gr. L. Schuyler, both parties to the contract understanding at the time that, although the makers were insolvent, the notes were secured by the hypothecation of three hundred and seventy shares of New York and New Haven Eailroad stock, of which hypothecation the plaintiffs were to have the benefit, then, as it turned out that there was really no stock hypothecated, the defendant having been imposed on by fraudulent certificates, I think the plaintiffs, upon offering to redeliver the certificate in season, would be entitled to call for the money they had paid the defendant, as money paid under a mutual mistake of material facts. Where there is a common mistake in respect to the existence of a thing undertaken to be sold, and it does not in fact exist, the contract for the sale is void, and any money which the purchaser has paid on account of it, may be recovered back in the equitable action for money had and received. (Story on Sales, § 148, and cases cited in note 3-7; Wheadon v. Olds, 20 Wend., 174; Westropp v. Solomon, 8 Com. B., 345; Martin v. McCormick, 4 Seld., 331.) The general rule that money paid by mis *503 take may be recovered back, is exemplified in many cases other than sales, where one party has received money from another in the course of dealing respecting property or choses in action, and where the consideration of the payment was a supposed fact as to which both parties were laboring under a mistake. (Markle v. Hatfield, 2 John., 455; The Canal Bank v. The Bank of Albany, 1 Hill, 287; Wilkinson v. Johnson, 3 Barn. & Cress., 428; Kelly v. Solari, 9 Mees. and Wels., 54; Burr v. Veeder, 3 Wend., 412.) Where the transaction is a sale of chattels or securities which the vendor has sold as his own, and the mistake is as to his title, the vendee may also recover upon an implied warrantee of title; but if he will be satisfied with the money he has paid, he may, in such cases, resort to the equitable action. (2 Bl. Com., 451; 2 Kent Com., 478; Defreeze v. Trumper, 1 John., 274; Blasdale v. Babcock, id., 518; Jones v. Hyde, 5 Taunt, 488; Wheadon v. Olds, supra.) The defendant’s counsel, without controverting the general doctrine which I have stated, maintains that there is an exception in cases where the vendor derived the property from another party, and proposed to sell only such title as he had acquired; for which he referred to Morley v. Attenborough (3 Wels., Hurls. & Gor., 500), and Chapman v. Speller (14 Ad. & Ellis, N. S., 621.) In the first of these cases the sale was by a pawnbroker, of pledged property which had been forfeited, and was sold at auction pursuant to the pledge; and the other was the case of a purchase, by the defendant, of a chattel at a sheriff’s sale, and an immediate bargain with the plaintiff who was also attending the auction, that he might ■ stand in the defendant’s shoes at an advance over his bid. Both actions were upon an implied warranty of title, and in both it was held that the plaintiff could not recover. The special circumstances in each case were held to rebut the presumption of a warranty. But the action to recover back the money depends upon different principles, namely, upon a want of consideration which renders the contract of sale void; and this distinction was alluded to by Baron Parke, in the first mentioned case. I am of the opinion that the present action does *504 not fall within the supposed exception. The defendant had in his possession evidence of title to the stock, upon which every business man was then accustomed to rely with entire confidence. There was nothing to suggest to the most prudent person the necessity of making inquiry whether the facts of which the certificates professed to be the evidence, were really true. The fact about which the mistake occurred, was not only a material one, but, the makers of the notes having failed, its supposed existence formed the only motive for the plaintiffs entering into the transaction. When, therefore, it was ascertained that the certificates were fraudulent, and that no title to stock had passed upon the supposed hypothecation, or upon the assignment, the plaintiffs were, upon the case stated in the complaint, if sustained by the proof, entitled to recover from the defendant the money they had paid, with interest.
The plaintiffs’ theory upon the facts found is, that they became the purchasers from the defendant of his demands against the Messrs. Schuyler, and of his title to the stock hypothecated to secure their payment, in consideration of advancing to him the amount of those demands; while the defendant insists that the plaintiffs paid the notes in order to release the stock from hypothecation, and that, being so released, the defendant transferred it to the plaintiffs pursuant to the written directions of the Messrs. Schuyler, such directions being procured by the plaintiffs from the Schuylers under an arrangement with them, of the terms of which the defendant had no knowledge, and with which he had no concern ; and it is upon the determination of this question that the right to recover depends. Being wholly a question of fact, it should have been settled as such by the judge, leaving it to the general term of the Supreme Court to decide whether the finding was warranted by the evidence. Instead of this course, the several items of evidence are set forth in the finding; and thus an unsettled question of fact is brought here to be determined, contrary, as I think, to the method of proceeding prescribed by the Code. Waiving, however, as the parties have done, *505 this informality in bringing up the case, I will proceed to state my views upon it as though it were regularly presented.
The defendant was authorized, if he saw fit, to sell and assign his debt against the Schuylers to the plaintiffs, or to any one desiring to purchase it. In that event it would not have been paid or discharged, for it was essential to the idea of transferring a title to it that it should be kept on foot, and not be extinguished; for a debt or a security which has been paid up is no longer the subject of a transfer. What the plaintiffs desired when they applied to the defendant’s cashier, may have been to effect such purchase and transfer to themselves, though their language was inaccurate; for the inquiry which Mr. Bement made of the cashier was whether an assignment of the securities would be made upon discharging the loan. Whether this was understood by the officers of the bank as an application thus to purchase the debt and the securities, or, as the inquiry literally purported, to assign the stock certificates after the debt had been paid, is not, I think, material; for the answer was that the defendant would do nothing without the consent or order of the Messrs. Schuylers. The language, which follows in the finding, “ that the terms of an arrangement being thus understood, subject to this condition, an order was obtained,” &c., does not add anything to what had been before stated as to the application by the plaintiffs and the answer of the defendant’s officers. But the plaintiffs then resorted to the Messrs. Schuylers, and obtained from them an order, addressed to the defendant’s cashier, requesting him to deliver the shares of stock to the plaintiffs upon their paying the notes in question, for which those shares were pledged. This direction is perfectly explicit. If the defendant was willing to assign the debt and shares to the plaintiffs, on the debtors’ consenting, such consent had not been obtained. It does not appear that such a proposition had been presented to them. If it was, they do not appear to have made a favorable answer to it. If the plaintiffs, as I have supposed probable, in the first instance contemplated a purchase of the notes, and, if the defendant was willing to *506 sell them, with the assent of the makers, in order to give it effect it should have been shown that such consent was obtained. The transaction indicated in the order of the Messrs. Schuylers was a perfectly plain one. If the notes were paid, the defendant would have no further right to the certificates of stock. They would belong to the Schuylers, and would be subject to their order. In the absence of any order it would be the defendant’s duty to transfer it to them, from whom they received it. It would be a very .natural transaction, if the plaintiffs paid the money on behalf of the debtors, that they should be secured for such advance; and the plaintiffs considered the shares security for that amount at least. The transaction, apparently, then, was this: the plaintiffs agreed to lend the Schuylers the money to pay the defendant; and this, in their view of the case, they could safely do, as that payment would release the stock from the defendant’s lien, and render it subject to the Schuylers’ order, and they had that order requiring it to be transferred to them. Neither the circumstances of the case nor the forms of business required the transfer to be made directly to the debtors, and by them to the new creditors; and, as they had failed, this might be hazardous. The plaintiffs were made the nominees of the Schuylers to take the transfer, instead of having it made to themselves. What was further done to consummate the transaction is equally indicative of its true character. The notes, which were payable to the defendant’s order, were not indorsed, as they would have been if it had been intended to transfer them. On the contrary, a receipt of payment was written on each of them. That payment was stated to have been made by the plaintiffs, according to the fact; but it nevertheless showed that they were paid, and not transferred. They were delivered to the plaintiffs along with the stock, certificate and power of attorney. This was natural, for they were pieces of evidence which the plaintiffs might require, or which it would be convenient for them to have, in the final adjustment of their claim against the debtors or their assignees. This method of transacting the business would be equally *507 available to the plaintiffs, in the view which they then had of the value of the supposed shares, as a purchase of the original debt with the shares as collateral. The object of the plaintiffs was to make the deposit of $10,000 in the defendant’s bank available to the payment of their check to that amount. The defendant insisted on retaining it as a further security for the $25,000 owing to it, fearing that the failure of the debtors, who were supposed to hold a large amount of the stock, would depress it so that the shares hypothecated would not be adequate to the payment of the debt. The plaintiffs being without security for their check of $10,000, were willing to take the shares as security for the $25,000 and interest; and by doing so they would obtain immediate payment of their check. Now it was indifferent to them, in the then aspect of the case, whether they loaned the money to the debtors of the bank and took a transfer of the shares as a security for that loan, or became a purchaser of the debt, protected as it was by the hypothecation of the shares. Hence there are no grounds for conjecturing against the indications in the papers and the testimony of the defendant’s cashier, that the plaintiffs really intended when they consummated the transaction to become the assignees of the debt, instead of paying it and taking a transfer of the shares as security for a loan arising upon such payment. It is not clear that the defendant would be equally indifferent as to the shape which the transaction should take. He distrusted the security which the stock alone afforded him, though he did not doubt the genuineness of the certificates. In consequence of such distrust, he claimed to retain the deposit of $10,000; but he agreed to relinquish it upon the consummation of the .transaction with the plaintiffs. It is natural that he might not be willing to retain the relation of assignee of a debt still to be kept on foot, and thus by possibility be made a party to proceedings which might eventually be had respecting it. There is some evidence of such a disposition in the fact found by the judge, that he requested to have the stock transferred to the plaintiffs on the books of the corporation *508 without delay, as in that way the bank would be wholly disconnected with the subject. Again, the defendant had a perfect right to sell and transfer the debt, and the collateral pledge as incident to it, without the consent of the debtors; but, the debt being paid, he could not transfer the stock to any one, except the debtors, without their order. But he did require the debtors’ consent to what was proposed to be done. The inference is strong, that what it was proposed to do was a thing which would require the consent of the debtors, and not a transaction to which that consent would be immaterial. It is possible that a sense of delicacy might lead to a contemplated transfer being communicated to them, and their consent asked, had they remained in credit; but I conceive that this would not be thought necessary towards insolvent debtors, if the defendant was otherwise disposed to assign their securities. But further, the defendant would not of course be willing to become indorser to the plaintiffs on these notes, as he had not full confidence in the adequacy of the security, especially as he was about to commit that security to the management of others. But he might have indorsed them sans recours, which is a well known method of transferring such paper without incurring the responsibility of an indorser; and this, or something equivalent, would have been done if the arrangement was that the notes were to be transferred as unpaid paper; yet there was no agreement, nor any conversation looking to such a mode or transfer, nor in fact to any kind of transfer.
These considerations have led me to the conclusion that the plaintiffs paid the notes instead of purchasing them, and that they obtained the power of attorney from the defendant as president of the bank • (which was in substance a transfer of the shares to them), by virtue of the order of the Messrs. Schuylers, as a transfer of shares which the latter had a right to control, and not upon a purchase by the plaintiffs from the defendant.
There is no doubt, however, but that the plaintiffs entered into the transaction under a mistake of fact as to the genuine *509 ness of the certificates, nor but that the defendant was equally mistaken upon that point; and the mistake was not only an important but a vital one. But that does not enable the plaintiffs to recall the payment they have made. The case is not in any legal aspect different in principle from what it would have been if the defendant had adopted the circuitous course of transferring the stock to the Messrs. Schuylers, and if these gentlemen had themselves transferred it to the plaintiffs as security for their advance. The defendant rid himself as effectually of it by transferring it according to the Schuylers’ order, as if they had transferred it directly to them. The plaintiffs’ title is derived from the Schuylers, and not from the defendant. The latter was simply the instrument of the other parties to make the transfer in form, after he had ceased to have any interest in the subject. The case then is strictly this: The Schuylers owe the defendant money, and they procure the plaintiffs to pay that money. As security for such payment, or upon some other consideration not disclosed, they at the same time procure the defendant to transfer to the plaintiffs a certificate of stock, of which the defendant held the formal title, but which belonged wholly to the Schuylers, and was subject to their control. Both the plaintiffs and the defendant thought the certificate valuable, but it is in truth worthless, and the plaintiffs have lost their money. With whom did the plaintiffs deal for the stock ? Mot with the defendant, who did not have and did not profess to have any beneficial title to it, but with the Schuylers, who, when their debt to the defendant was paid, were the owners. The defendant assumed nothing, warranted nothing. What he had received on the loan to the Schuylers he was bound and was willing, the loan being paid, to give back to them, if they chose to take it, or if not, to the parties whom they should name to be the recipients of the title. They named the plaintiffs, and the defendant made the transfer to them. I can see no reason why such an act should involve any responsibility on the part of the defendant.
*510 Upon such a proposition one would scarcely expect to find an authority; but it appears that the Court of Exchequer, in England, has recently passed upon a case, which, if I am not mistaken, presents precisely the same principle, though upon facts circumstantially different. One Carter borrowed money of the defendants’ testator, and gave his bond, and an equitable lien upon property to which, as it was supposed, he had title under the will of his brother. Carter^afterwards conveyed the property to the plaintiff as security for money, subject to the lien he had created in favor of the testator of the defendant. The defendant, as executrix, required payment from Carter, who referred her to the plaintiff, upon which the plaintiff paid the debt to her, considering it to be so much advanced on account of the property Carter had conveyed to him. It was soon after discovered that Carter’s brother, before he died, had made a second will, disposing of the property in a different way, and that consequently neither the defendants’ testator nor the plaintiff acquired any interest by means of Carter’s conveyances to them. The plaintiff sought to recover back what he had paid the defendant, as money paid by mistake; but it was held that the action could not be maintained. Four of the barons expressed opinions, agreeing that there was no ground for a recovery. Pollock, C. B., said the defendant had a perfect right to receive the money from Carter, and that the plaintiff must be considered as paying it as Carter’s agent, and if so, he could not recover it back. Platt, B., also said the plaintiff must be considered as paying in the character of Carter’s agent. “Surely,” he said, “the debt is satisfied. The debt was due. It is not as though there were no debt due, and there was a mistake of fact; but here the debt was actually due, and the money was paid to satisfy the debt." Bramhall, B.: “ It seems to me that the right to recover money paid under a mistake of fact must have reference to a belief in the existence of a fact, which, if true, would have given the person receiving a right against the person paying the money; and it never can be applicable to a case where the fact mistaken is a ■fact which would merely have made it desirable for the person *511 paying it, to pay it to the person receiving it. The truth is, these parties [ the plaintiff represented a bank ] were at liberty to pay the money, or to let it alone. They were under no obligation to pay it, but believing the defendant had a valid security on an estate which was pledged to them, they think it fit for their own benefit to pay this sum of money to the defendant. It afterwards turns out that they do not get the benefit they expected, because a fact that they thought existed does not exist. But it seems to me impossible to say that they paid this money under such a mistake of fact as comes within the rule, so as to authorize them to get it back, any more than they would be authorized to get it back in the case of a man coming to me and saying ‘you have certain goods in your possession, pledged by A. B. to you. I bought these goods, and I desire to pay his debt and get them away.’ ” (Aikin v. Short, 37 Eng. Law and Eq., 592.) It would not be easy to add anything to the force of these observations, which are as applicable to the case before us, as to the one in respect to which they were made.
On the argument some stress was laid upon the circumstance that the defendant had surrendered the original fraudulent certificates issued to the Schuylers, and transferred by power of attorney to the bank, and taken out a new one in his name as president, as though he had affirmed something in respect to the shares by that act. But it was well understood that this certificate was procured mediately or immediately by the Schuylers, and that neither the defendant nor the bank had any title to it, except through them. When the plaintiffs obtained the transfer from the defendant, they regarded themselves as getting the Schuylers’ stock which had been released from the pledge to the defendant’s bank, and not any new title which the latter had acquired by the new certificate. It has been often decided in regard to genuine stock, that the identity of a given number of shares is not changed by the surrender of the certificates representing them and taking out new ones in another name. (Nourse v. Prime, 4 John. Ch., 490; Allen v. Dykenr, 3 Hill, 593; S. C., 7 id., 497; Horton v. Morgan, 19 N. Y., 170.)
*512 I do not understand that it was claimed by the plaintiffs that if they are wrong in respect to the branch of the case which has been considered, that they were entitled to recover in respect to the check for $10,000, and I see no ground upon which such a claim could be sustained. Whether the defendant was warranted or not in refusing to pay the check on either of the two occasions on which it was presented, the plaintiffs’ claim in respect to it was adjusted and paid, when the arrangement concerning the stock was consummated; and if the defendant incurred no liability in making that arrangement, the payment of the check, which was the result of it, extinguished any grounds of action which might have existed respecting it.
I am in favor of affirming the judgment of the Supreme Court.
Johnson, Oh. J., Comstock, Selden and Grover, Js., concurred.